UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Michael J. Binns and Mary Ann Binns, | ) | Case No. 03-56535-293 |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| Karen Jacobus, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | Adv. No. 04-04091-293 |
| | ) | |
| Michael J. Binns and Mary Ann Binns, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Karen Jacobus ("Jacobus") seeks to except from the discharge of Michael J. Binns and Mary Ann Binns ("Debtors") nearly $800,000 as the result of a judgment she obtained in an Illinois state court action. The Court conducted a trial on August 25, 2008. For the reasons set forth below, the Court will enter judgment in favor of Jacobus and against the Debtors.

1

## JURISDICTION AND VENUE

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 151, 157, and 1334 and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. § 1409(a).

## FINDINGS OF FACT

Jacobus worked in the banking industry for over 20 years. In 1999, she was the community vice president at Union Planters Bank. She knew the Debtors because they were customers of the bank. The Debtors approached Jacobus about purchasing their Hallmark store ("Marilyn's Hallmark") in Sparta, Illinois, because they knew of Jacobus' desire to leave the banking industry. After their meeting, Jacobus expressed her interest in purchasing Marilyn's Hallmark from the Debtors and negotiations began between the parties. The Debtors provided Jacobus with access to their financial and insurance information and she performed her due diligence.

2

On December 31, 1999, Jacobus purchased Marilyn's Hallmark store ("Hallmark Store") from the Debtors. To memorialize the transaction, Jacobus and the Debtors completed an Asset Purchase Agreement ("Agreement"). The Agreement called for a purchase price of $371,000. Jacobus provided the Debtors with a cashier's check of $250,000 at closing. She financed this amount with loans that she took from her 401(k) retirement plan. She financed the balance by making monthly loan payments to the Debtors. In exchange for the loan from the Debtors, she granted them a security interest in certain items of the Hallmark Store.

Almost immediately, Jacobus began to have problems. The Hallmark Store was designated a "Gold Crown Store." This was a designation reserved to those Hallmark stores that met certain quality standards. Unfortunately, Jacobus could not initially meet these standards. First, the Hallmark Corporation was not aware of the transaction that took place between Jacobus and the Debtors. Hallmark representatives only found out about the Agreement because Jacobus appeared at a Hallmark trade show in Atlanta, Georgia, with Mary Ann Binns. They told Jacobus that she could not use the name "Marilyn's Hallmark" for her store since the Debtors still owed money to the corporation. To resolve this problem, Jacobus

3

incurred between $4000 - $5000 in attorney's fees.  Second, the Hallmark representatives said that the equipment in Marilyn's Hallmark had no value and that Jacobus would have to replace it to retain its Gold Crown status.  Third, the inventories in Marilyn's Hallmark were either missing or obsolete.  Finally, there was a problem with the "goodwill" component of the Agreement.  After the sale took place, Jacobus learned that the community did not respect the store or the Debtors.  As a result, her business suffered and Jacobus returned to the banking industry to supplement her income.

One of the documents that the Debtors provided to Jacobus prior to the sale was a cover letter and an attached set of financial statements ("Financial Statements") that were purportedly prepared by Steven G. Falkenhein, a Certified Public Accountant.  Michael Binns provided the Financial Statements to Jacobus.  It showed the total sales for Marilyn's Hallmark as follows:

| Year | Amount |
|---|---|
| 1996 | $524,824.52 |
| 1997 | 599,708.92 |
| 1998 | 640,189.27 |
| 1999 | 683,402.05 |

Jacobus based her decision, in part, on the Financial Statements.  At trial,

4

Jacobus testified that the total sales in 1999 were only $350,000 and that her total sales since the purchase never approached the amounts that Financial Statements identified. She estimated that the total sales for 2007 were only $250,000. In early August 2000, Jacobus received a letter from Patrick B. Mathis, attorney for Steven G. Falkenhein that refuted the veracity of the Financial Statements that the Debtors provided to Jacobus. The letter said in part:

> The financial statements attached to the cover letter purport to be statements prepared by Mr. Falkenhein. However, after reviewing the financial statements given to Ms. Jacobus, Mr. Falkenhein realized that they were not the compilations he prepared; moreover, the statements contain incorrect information as to the financial condition of the business as of the purported statement date.

Based on this false information, Jacobus sued the Debtors in Illinois state court. On July 30, 2002, Jacobus received a default judgment against the Debtors and Binns & Binns, Company, Inc., jointly and severally, in the amount of $597,890, plus $200,000 in punitive damages and the cost of the suit in the amount of $1,116.75. The court specifically found that the Debtors engaged in fraud by intentionally overstating the gross sales amount in 1999 and for providing false financial documents to

5

Jacobus to induce her purchase of Marilyn's Hallmark.

The Debtors filed for Chapter 7 bankruptcy protection in 2003. Jacobus filed this adversary proceeding in April of 2004. In January 2007, the Debtors pled guilty to failing to disclose assets in a bankruptcy proceeding. In March 2007, Michael Binns was sentenced to 42 months in prison, plus two years supervised release. Mary Ann Binns was sentenced to 6 months of home confinement and 80 hours of community service.

## CONCLUSIONS OF LAW

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension . . . of credit, to the extent obtained by . . . use of a statement in writing. *11 U.S.C. § 523(a)(2)(B).* This written statement must be 1) materially false; 2) respecting the debtor's or insider's financial condition 3) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied and 4) that the debtor caused to be made or published with intent to deceive. *11 U.S.C. § 523(a)(2)(B)(I) - (iv)*.

First, the written statement must be materially false. It is clear that the Financial Statements that the Debtors provided to Jacobus were

6

materially false. Jacobus introduced the default judgment into evidence. Mary Ann Binns did not contest the entry of this document, so the Court admitted it as competent evidence. The judgment included language that the Debtors intentionally overstated the gross sales amount in 1999; that the Debtors provided false financial records to Jacobus; and that the Debtors' actions were intentionally fraudulent.

Second, the written statement must concern a debtor or insider's financial condition. The Bankruptcy Code defines an insider as a "corporation of which the debtor is a director, officer, or person in control." *11 U.S.C. § 101(31)(A)(iv)*. The Debtors were clearly in control of Marilyn's Hallmark. Indeed, the Agreement notes that Mary Ann Binns was President of Binns & Binns Company, Inc. Additionally, Michael Binns participated in the negotiations of the sale and provided the Financial Statements to Jacobus. The Debtors were insiders as defined by the Bankruptcy Code and they provided Jacobus with statements concerning their financial condition.

Third, the creditor must have reasonably relied on the written statement. Clearly, Jacobus reasonably relied on the Financial Statements that the Debtors provided. She made the decision to purchase the

Hallmark Store and took loans on her retirement account to help finance the purchase. At trial, Mary Ann Binns suggested that Jacobus had access to all of the Binns' financial and insurance information. She argued that Jacobus did not perform adequate due diligence prior to the purchase of Marilyn's Hallmark. The Court rejects this argument. Regardless of how much due diligence Jacobus performed, the fact remains that the Debtors provided written financial information to her that was false and she reasonably relied on it.

Finally, the Debtors must make or publish a written statement with the intent to deceive. The Court concludes that the Debtors prepared the Financial Statements and not Mr. Falkenhein. The evidence suggests that the Debtors' actions were intentional acts of fraud as the Illinois court found. The Debtors prepared the Financial Statements solely to induce Jacobus' purchase of Marilyn's Hallmark by inflating sales amounts.

In sum, the Court holds that the debt owed to Jacobus by the Debtors is non-dischargable by virtue of 11 U.S.C. § 523(a)(2)(B).

8

The Court will enter judgment in favor of Jacobus and against the Debtors.

Judgment will be entered by separate order.

DATED: September 9, 2008

St. Louis, Missouri
mtc

David P. McDonald
United States Bankruptcy Judge

Copy mailed to:

Edward Renshaw
Counsel for Plaintiff
2001 W. Main St.
P.O. Box 1570
Carbondale, IL 62903

Michael J. Binns
Mary Ann Binns
Defendants
403 Hunters Crossing Ct.
Wildwood, MO 63040

Michael J. Binns
Registered Number 33000-044
USP McCreary
U.S. Penitentiary
P.O. Box 3000
Pine Knot, KY  42635

U.S. Trustee
111 S. 10th St.
St. Louis, MO 63102

9